All rise. Hear ye, hear ye, hear ye. This Honorable Appellate Court of the Second District is back in session pursuant to adjournment. The Honorable Anne Brackley directs this residing. Please be seated. Your Honor, this is the second case in the morning called People of the State of Illinois v. Sean Parker and Bridget Eisenhoff on behalf of the affluent Mr. Paul Rogers on behalf of the affluent Ms. Sally Stritz. Are both sides ready to proceed? Yes, Your Honor. Mr. Rogers, you may proceed when you are ready. Thank you. Good morning. May I please report, counsel? Your Honor, the primary issue in this case is whether the state has met its burden of proving beyond reasonable doubt that both defendants acted without lawful justification, specifically self-defense or defense of another. It's our contention, of course, that the state has not met this burden and therefore the convictions for armed violence against both defendants must be reversed. Now, I am aware, of course, of the court's order directing us to consider the cases of Cooper and Redmond, which relate to the secondary issue, which is whether the evidence was sufficient to convict Mr. Parker specifically on the theory of accountability. I'm certainly prepared to talk about those cases. Just by way of preview, I would say that it's really a twofold answer. First of all, my reading of those cases is that they in no way undermine the argument on behalf of Mr. Parker in this case. And more importantly, it doesn't matter because, again, it's our position that both convictions should be reversed on the basis of the first argument and that therefore you don't even need to reach the accountability issue. How do you address Ms. Ivanov's self-defense with the knife when the victim in this matter had no weapons on him? I don't think that it is required that you see a weapon. Well, you want to use a force that's equivalent to force. You have to use proportionate force, right. You can use force that's designed to cause, or not designed, but that is likely to cause great bodily harm or death when you yourself are in fear of receiving the same. Now, first of all, under Ms. Ivanov's account, she is attacked by Mr. Fuentes behind the liquor store in the parking lot. He physically accosts her, and that's when she first uses the knife. And what do you, how do you define that term, accosts her? Well, I won't define it. I'll just say what she said, which is that he solicited her for sex. She declined, that he became angry, and that he grabbed her shirt, pulled on it, ripped it to the point where her breasts were exposed. It's not clear whether she meant her bare breasts or her bra, but ripped her shirt. So she was physically apprehended by Mr. Fuentes. Didn't the store clerk disagree with that rendition? The store clerk was not in a position to see that part of the area. That was, if you could. No, I'm not talking about what he, he didn't see the transaction. What he said was he didn't see that after the incident that the shirt wasn't torn, which meant that if he saw that the shirt wasn't torn, then he was impeaching her testimony or contradicting it to the extent that she claimed it was torn at a time when he wasn't even able to see it being torn. And his position was, I saw that it wasn't torn sometime thereafter, which if this is an issue of credibility and we're supposed to give deference to the findings of this prior effect, how are you going to get around a third party's apparent disinterested observation that even though he didn't see whether or not there was a proposition, he at least saw that the sine qua non, the torn shirt, was not torn. That's what he said in rebuttal. Neither he nor Mr. Lopez, the other store employee, the two employees, Watkins and Lopez, they both testified in rebuttal that the shirt was not torn. Neither of those had mentioned that during the state's case in chief. Now, why would they mention it? How would they anticipate or how would the state anticipate that unless they were told that was the defense or the transaction that transpired? They were told that in opening argument. And it was disclosed in the pre-trial discovery that the defense was going to rely on self-defense in defense of another. And I believe in opening arguments, opening statements rather, defense counsel laid out the theory of the case, including what Ms. Ivanoff would be testifying to. And the other thing about the shirt, which is interesting, is that Mr. Kouakas testifies in rebuttal that when Ms. Ivanoff supposedly came back into the store after the whole incident, she, her shirt was not torn, at least not to the point where you could see her breasts or her brazier. Yet when he was shown the item in court, he said, yes, it's torn. So it was never explained how it could have been torn during the interim. If it was not torn when he saw it at the incident, it was torn at the time of trial, then either he's confused or somehow, or he's lying, or it somehow got torn in the interim. But there's a paucity of evidence as to exactly how the shirt came into the possession of the police. I think it's fair to infer from the evidence that the police seized that shirt immediately afterwards when they apprehended, they detained both Mr. Parker and Ms. Ivanoff about a block and a half from the store. They were just walking down the street. There wasn't any specific testimony about that. The shirt itself obviously wound up in evidence. It was never tested. I believe that I've supplemented the record with the blouse itself, at least with photographs of it. The court can make its own determination of whether it's torn or not. Isn't that the job and wasn't that the job of the jury to make that determination, to weigh the credibility of the witnesses as to whether or not it was torn when she went back into the store or whether it was subsequently torn? I think that's the question that Justice McLaren asked you. Well, that's true, and that is the jury's function, and that's always the jury's function. And that relates to a broader point they wanted to make, which obviously the burden here is on the state. The state spends much of its time trying to discredit Ivanoff's testimony, as if the falsity of her testimony somehow necessarily means that their evidence is sufficient. And I submit that's a faulty inference. This is not a choice between competing versions. You start from a position, and the jury starts from a position of innocence, and the question is whether it's rational, based on the evidence, to eliminate reasonable doubt as to whether these defendants acted with lawful justification. Sometimes the quality and quantity of evidence is such that the only rational decision is that you can't decide what happened. Sometimes indecision, uncertainty, and doubt is the only rational response to a given set of circumstances. And that's really why I cited the Washington case, or asked Lee to cite the Washington case, because I think that illustrates that point. There are situations in which a rational person, confronted by a body of evidence, has to shrug, scratch his head, throw up her hands, admit that you're in a heavy fog and you can't, you're lost. You need to suspend judgment. But here the jury did decide. Pardon? Here the jury did decide. They were not in a position where they didn't think they could take all of this granted, scattered evidence, put it together in a picture that the 12 of them could agree on. That's true. And that's always true when there's a guilty verdict. And I understand the deferential standard of review, and it's certainly not here to challenge that. But there's a reason why we have courts of appeal. It's important to have a backstop. Every time a conviction is overturned on the basis of reasonable doubt, it means a reviewing court has found that the jury, despite its best efforts or best intentions, has made an irrational, unreasonable decision. This is an important backstop in our system. I don't know that we've determined that they made the wrong decision. I think we've determined there's not enough evidence to support that decision. Right. I think that's a better way of putting it. I think that they made the wrong decision in the sense that they decided that there was no reasonable doubt. The Scottish verdict is? Exactly. Right. Okay, then you know what I'm talking about. Yes, exactly. And I think that point is made in Washington in the concluding paragraph. Now, to talk a little bit more about the specifics of this case, the State needed evidence of a common criminal design, a common criminal scheme, not just for the accountability issue. Obviously, if there's no common criminal design or insufficient proof of that, there's no basis to convict Mr. Parker at all. But I would submit that there's also no basis for convicting Ms. Ivanoff if there's no common criminal scheme, because otherwise Fuentes' testimony makes no sense, and the jury would have had to have concluded that Mr. Fuentes was just attacked by Mr. Parker and Ms. Ivanoff for no apparent reason. Okay, well, let's go back to that then. You have Mr. Parker holding Mr. Fuentes down on the ground and Ms. Ivanoff on top of him with a knife stabbing him. And this is what two witnesses said, testified to. And so where's the self-defense? Well, first of all, let me just correct, and I think only one of the store employees saw the stabbing itself, and I think that was Mr. Kouakas, whichever one it was. I think it was only one, but I take your point. The self-defense is that Ms. Ivanoff's version, which is, I think, just as plausible as Mr. Fuentes', if not more plausible, given the many weaknesses in Mr. Fuentes' testimony, but this is a situation where she's been a victim herself in the parking lot. She yells, her boyfriend, Mr. Parker, is across the street. He comes across the street, and even by Mr. Fuentes' own admission, Fuentes threw the first punch at Parker, and that starts the physical fight. And at that point, so you have Parker coming across thinking, my girlfriend's in trouble, I better go over and find out what's going on. Then this guy's swinging at me. Then somehow I'm on the ground, although Mr. Fuentes minimizes the amount of time he's on the ground, which is contrary to what the store employee said. And then Ms. Ivanoff is there, and she's saying, my boyfriend, who, by the way, has one of his legs in a very big knee brace, a very big leg brace, which everybody except Mr. Fuentes noticed, she's in a position of saying, well, now my boyfriend's in trouble. I need to help him, and she reacts spontaneously by trying to help him, by trying to get Fuentes, who's extremely intoxicated, to stop beating up her boyfriend so that this can be over and they can leave, which is exactly what they did. And I mentioned that there are a lot of problems with Mr. Fuentes' testimony, and he was obviously the state's key witness. Well, wouldn't you say that this Jose Cuauhtas is the key witness? He's untainted, unbiased. He was an eyeball witness. He was not drunk. It seems from reading the record that the other three were all either drunk or lying or didn't know what they were talking about. So would you really say Mr. Fuentes was the key witness? I would say that he is. I guess that's a judgment call. I understand your point. He's certainly the most disinterested witness. So in that sense, the most – Fuentes is not the most disinterested. No, Cuauhtas is the most disinterested witness. Yes, I would agree with that. He's also presumably the most sober witness, although I don't know that there was much evidence that Parker was – how seriously Parker and Ivanov were intoxicated. But the thing about Cuauhtas' testimony, though, is he came in the middle of the movie. He doesn't see how the fight started. He kind of sees how it ends. He doesn't know what anybody's motivation is. He sees certain actions. The actions he sees are perfectly consistent with both versions of what happened here. So – and nobody – Ms. Ivanov doesn't even deny that she stabbed Mr. Fuentes. She doesn't remember distinctly doing it while they're in front of the doors there where Cuauhtas could see them. But she didn't really deny it either. She said it was all kind of a blur and she was just, you know, scared for her life. I think she was scared to death, I think were the words she used, and was kind of in a frame of mind of panic. And undoubtedly, you know, he was stabbed, but that doesn't tell you anything at all about who the initial aggressor was or what happened in the parking lot before all this happened. And so Cuauhtas – what he saw doesn't answer the important – the questions that you need to answer in order to resolve this case. And so that's why I referred to Mr. Fuentes as the key witness. But don't – aren't the questions that you're asking us here today, your questions that you're posing, aren't those questions that the jurors addressed at the trial court level and now you're asking us to reverse their decision? That's right. And that's because I think that while it's understandable that courts of review should be reluctant perhaps to do that, they also need to be unafraid to do that when necessary, to perform the function of being the backstop. And I know that my time has expired, so I will – unless there are any more questions, I will not proceed. You will have an opportunity to reply. Thank you. Ms. Riz? Good morning, Your Honors. I really intend to stand on my brief to a large degree in terms of the actual facts because it is so factual. There's so many small inconsistencies. There's so many points brought up by opposing counsel. But I did want to make just a few points in relation to what he has already brought up here, and that is this is a credibility determination. It apparently is the defense's position that no rational traitor fact could have found a lack of justifiable force by the defendants. And what we have really is not only a witness who definitely, as we admit, he was drunk, but he still gives a consistent – he isn't filled with inconsistencies. His version, and more than that, I think, the version given as to how it could possibly be justifiable force, the version given by Defendant Ivanov, is totally incredible. And it's rebutted by an independent witness. And I do believe that Mr. Kwakis is our most important witness because he had no relationship with either the defendants. He had no relationship with Mr. Fuentes. He's not drunk. He's looking out the window, and he reports what he sees. And what he sees is a physical confrontation in which certainly the level of force used with the stabbing and the amount of bodily harm that's inflicted is not justified by a victim who's on the ground while this beating is taking place, at least for a small part of it. Okay, say we agree and we find – certainly we agree with the jury, find that their verdict was proper, or we agree that, yeah, there was really no self-defense here. Let's move now to the accountability. Okay. And how is Mr. Parker accountable for Ivanov's actions when she was in the fray first and then she walks away, he comes over, and then she jumps back in? So how is – did you have an opportunity to address the case, the Redmond case? I did. To look at Cooper and the Redmond case? I did. How does he find accountability in this case? I think both of those cases actually had a fair amount of applicability to this situation. And the sharing of the common design really – there had to be a criminal act to which he attached himself, and he attached himself whether it was her preceding him by a few seconds or him preceding her by a few seconds in this physical altercation that was not justified, as we've already argued, against this person to cause him bodily harm, in other words, a battery of sorts. You said preceding, and then you indicated that one may have preceded the other. If you haven't said what I thought you were attempting to point out, and that was that regardless of who preceded whom, there were actions that were taken that were simultaneously contemporaneous. That's exactly it. Whether somebody was a foot ahead of the other or whether there was some act that was testified to by someone that this might have happened first, what this was was a simultaneous action. Because what we have is we have Mr. Parker charging Fuentes, and at the same time – or just about the same time, within a few seconds or a minute, we have the defendant Parker – or, excuse me, defendant Ivanov behind him. And he says he heard her voice from behind him saying, that's what you get. And at that point – or not at that point exactly – Mr. Fuentes says that he feels a wetness seeping from him. We know, of course, he ends up with four stab wounds and two lacerations, which I think were, from my understanding of the record, they were also likely caused by the knife. So we know that he was being stabbed. Obviously, there's no question that she was the one who did the stabbing by the identification, by the bloody knife, all that type of evidence that we have. So this was a simultaneous action. He gets out and starts physically with his fist to beat up Mr. Fuentes. She has a knife. Now, whether he knew she was going to use that knife – and I take this from, you know, the cases that we looked at – it doesn't really matter if it was foreseeable or not. And I believe that's Cooper. It's a matter that they both went into this knowing it was a criminal act. And they did know it was a criminal act because, for the reasons we've stated, we don't believe there was any indication that this was justified. So they started this together. And as soon as – excuse me – as soon as the liquor store person sees them, they're doing this simultaneous act of he's on the ground. And during this time, she is stabbing him. And certainly, again, it's not clear if it was exactly at the same time or within a few seconds. But when he looks out, he sees the Fuentes on the ground, and he sees both Ivanel stabbing and standing over him, and also sees Parker, you know, restraining or hitting him while he's on the ground. These acts are obviously acts that were in concert. They were done together. The placement of the stab wounds, too, on the flanks and on the top of the head are consistent with what Cuauhtas saw happening to him. So – and in terms of the reasonable doubt argument, too. They were working in concert in a shared common design to cause Fuentes the bodily harm. Now, whether – like I say, whether or not our defendant, Parker, knew that the knife was going to be used or that it was even foreseeable that she would be using this knife doesn't really matter to the analysis. Parker aided Ivanel in making contact and causing the bodily harm. And when she inflicted the multiple stab wounds on Fuentes, he was accountable, even if he didn't know that that was going to happen, because the criminal design, once it started, does not have to go to every specific act of each participant. And as – again, as Redmond says, you can be accountable for a different crime, so even if their criminal intent was only to do some type of bodily harm, some type of battery, it doesn't matter that it turned into something different with the stabbing. There's no need for any words of agreement, and we don't have that here. But we can look to the relevant circumstances, and those circumstances are not only the ones I've just pointed out, but we can also look to those which occurred afterwards in determining whether or not there are circumstantial – there's circumstantial evidence which shows that this person really was acting with this one, and that comes from a lack of disassociating oneself with the person who did the act. Afterwards, we know that not only – presence is one of the factors – we know that not only was Parker present, he was actively involved in this. So we have that. Flatter left the scene. They did. They left immediately. Walked away. He walked away and she followed him. And they left without making any type of police report. And in fact, importantly, we have evidence, again, from the two employees of the liquor store that Ivanov appeared after this in the store and kind of yelled at the person who had called the police and tried to intimidate him for having called the police. So obviously this is not something – not only does it show consciousness of guilt, but it shows that she still was in this for the criminal design of causing harm. And he did not – Parker, meaning Parker – did not disassociate himself. They found them walking together a few blocks away. So they maintained a close affiliation with each other until the police stopped them. And those circumstances also show a criminal design. Just real briefly as to the Washington case, which was cited as additional authority by opposing counsel, that case is very distinguishable. And there it really turned on a lack of credibility of the witnesses in terms of whether or not there was some type of act that was made in furtherance of the criminal enterprise. And the act there was that the defendant supposedly was driving the car from which the shooter fired the shots. But the only people that put him as the driver – because when the car was stopped, he was not the driver – the only people that put him as the driver were both accomplices. Both had received deals for their testimony, and they both testified – or excuse me, they both had contradictory statements such that they were basically incredible witnesses. There was a dissent in the Washington case. There was, yes. I think Justice Bowman dissented. But here we have something totally different. We have two witnesses who have no allegiance to Fuentes or to either of the defendants. They identify him as the man they saw in this fight acting in a criminal manner. Their testimony was backed up by the forensic evidence after the fight occurred, and the blood from Fuentes was all over his shirt, as well as the co-defendant saying that he was involved. So we know he was involved in a criminal act, and the testimony here is not incredible the way it was in the Washington case. So unless your honors have other questions, I would just ask that you affirm the defendant's convictions and sentences. I have a question. Yes. Does the testimony of Mr. Fuentes relative to the alleged altercation where two people attacked him has anything to do with impeaching his testimony? As to what happened at the liquor store? Yes. No, I don't think so at all. I don't think it's impeaching. I think it's kind of a bit of a loose thread in the sense of showing motive. I think that's really what that evidence was in there for, that there was a tie-in because despite the fact that he didn't identify defendant as one of the men, he said it was two black males, 40 to 50, wearing a gray shirt, and defendant fit that description. And, of course, this happened just a few minutes later as he pulled in just, you know, maybe a couple hundred feet down the road and immediately was attacked by Mr. Parker. From that, I think that there's an inference that these two things are related, but certainly there's nothing that undermines his credibility. I don't think that that happened. And if the jurors didn't believe that that was the defendant or that that had a part of this, they didn't have to. They could look at it from the start at the liquor store, and that's where the criminal design could start. Thank you. Thank you. Do you wish to reply? Yes. You may proceed when you're ready. Thank you. I'll start, I guess, with the last point that was raised by Justice McLaren's question about the supposed carjacking. I think it says a lot about Mr. Fuente's credibility. He's the only one. There's absolutely no evidence that this occurred. There certainly is no evidence that. If there's evidence, maybe there's no corroboration. Well, right, there's no corroboration that it occurred. And the fact that he said that one of the people in the carjacking was a black male with a gray T-shirt, it fits the general description of Mr. Parker. Of course, he never did say, in fact, I don't think he was ever asked whether Parker had also been involved in the carjacking. And honestly, I think that's something that he would have volunteered if it had been true. Who would have volunteered it? Fuente's when he was interviewed by the police at the hospital. He told the story about the carjacking, but he didn't say, oh, by the way, those are also the people that, you know, one of the guys followed me to the liquor store and he attacked me there, too. He didn't really get a good look at the people that attacked him at the stoplight. He's he got a good enough look to be able to tell the black male age 40, 50 and a great T-shirt. Whether you saw the face or not, I don't know. But being careful, you don't want to wrongfully accuse him. That's certainly true. However, I would notice, call attention to a couple other facts just quickly about this supposed carjacking. That's the carjacking supposedly the reason why Mr. Fuente turned into the liquor store looking for help. He was afraid and he wanted to get help. But if you read it carefully, you'll notice that when he pulled in the liquor store, he doesn't just stop and get out so that his driver's side door is close to the exit door. He went in the back and made a U-turn and turned around so he had to get out on the outside and walk around the back of his car. And according to one of the witnesses, he's talking to Ivanov. Now, I think if somebody was fleeing a carjacking, he was really that afraid. And by the way, he also said he really wasn't sure he had been injured at that point. So it's not clear what he needed help for at the store or what he expected to get at the store. He couldn't have gotten it at the hospital or the police station or his brother-in-law's. But it's curious to me that he would make a U-turn if he indeed was so in need of help. And he might have had a reason for doing it. And I'm sure that was argued to a jury, too. What's our standard of review here? With respect to the – well, it's the deferential standard of pleasant objections versus – Jackson v. Virginia, which is that whether any rational prior effect could have found the elements of the offense beyond a reasonable doubt, including the element of lack of lawful justification. I wanted to mention quickly, if I may, as far as the question about the proportional use of force, which was brought up earlier. Now, that's a case – I think that's a state's sort of fallback position.  And it's a case of the state, I think, trying to have it both ways and sort of straddling the fence. Because on the one hand, it's like, well, you believe Ms. Ivanoff. She's acting in self-defense, or she thought she was acting in self-defense, but she went too far. Well, you know, I think that's an awkward position for the state to take. Now, and as far as what Kouakis had to say, first of all, although he is disinterested, as I said, he does have some motive to testify in favor of the state in that he's in the country illegally. And therefore, there's no evidence that they – Was that brought up before the jury? Yes, it was. The jury knew that. So they could take that into account. I understand that. But it still is something that we can take into account at this level also. Also, as I pointed out earlier, Kouakis – it's still very hard to reconcile his testimony that the shirt was not torn when it was in the store with his testimony – Isn't the inference there that as they're walking away, she tears the shirt or asks Parker to tear the shirt? I would not call that an inference. I would call that a possibility. It's something you can infer, but I don't know that it falls beyond a reasonable doubt, and there's no evidence of that. And certainly it's logically possible, but I don't think that it means that it happened. Isn't that what Sherlock Holmes would conclude, though? I would not put myself on that level. I think, though, he would be cautious to jump to conclusions that aren't warranted by the facts. And that's what I'm asking this Court to do, is to be cautious in reviewing this and to recognize that the jury should have been more cautious in coming to the conclusion that it did. And for the reasons that I've stated, I would ask this Court to reverse both convictions. Thank you. Thank you very much. We will be in recess until 10-3.